**FILED
CLERK**

4/25/2013 4:10 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
LUCIANO F. PAONE,

        Plaintiff,

    -against-

MICROSOFT CORPORATION,

        Defendant.
----------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
07-CV-2973 (ADS)(ARL)

**APPEARANCES:**

**Kirkland & Ellis LLP**
*Attorneys for the Plaintiff*
153 East 53rd Street
New York, NY 10022
    By: Andrew Gordon Heinz, Esq.,
        Jeanne M. Heffernan, Esq.,
        John Michael Desmarais, Esq.,
        Jon Todd Hohenthaner, Esq.,
        Ryan Charles Micallef, Esq., of Counsel

**Woodcock Washburn LLP**
*Attorneys for the Defendant*
2929 Arch Street, 12th Floor
Philadelphia, PA 19104-2891
    By: Dale M. Heist, Esq.,
        Daniel J. Goettle, Esq.,
        John E. McGlynn, Esq.,
        Steven J. Rocci, Esq.,
        John F. Murphy, Esq., of Counsel

**Westerman, Ball, Ederer, Miller & Sharfstein, LLP**
*Attorneys for the Defendant*
1201 RXR Plaza
Uniondale, NY 11556
    By: Greg S. Zucker, Esq.,
        Jeffrey A. Miller, Esq., of Counsel

1

**Winston & Strawn LLP**
35 West Wacker Drive
Chicago, IL 60601-9703
 By: Dan K. Webb, Esq.
   Raymond C. Perkins, Esq., of Counsel

**Microsoft Corporation**
One Microsoft Way
Redmond, WA 98052-6399
 By: David E. Killough, Esq., of Counsel

**SPATT, District Judge**.

  In this patent infringement case, the Plaintiff Luciano F. Paone ("Paone" or the "Plaintiff") alleges that the Defendant Microsoft Corporation ("Microsoft" or the "Defendant") has infringed United States Patent 6,259,789 (the "789 Patent"), held by Paone.

  Pursuant to Federal Rule of Evidence ("Fed. R. Evid. 702"), the Defendant Microsoft now moves to exclude the testimony of the Plaintiff's damages expert, Wayne Hoeberlein ("Hoeberlein").

  Microsoft contends that Hoeberlein's testimony should be excluded "for any one of five separate and independent reasons, as follows: (1) his royalty base is unreliable because it includes 'sales units' not part of an allegedly infringing system and never used to allegedly infringe; (ii) his royalty base is unreliable because it includes 'sales units' that – if part of or used in an allegedly infringing system – are found and used in such systems outside the United States (beyond the reach of the U.S. patent law); (iii) his royalty base is unreliable because it includes access rights (which have no software functionality) and overcounts periodic payments for single 'sales units' as if they were multiple "sales units"; (iv) his methodology for valuing TKIP (an alleged feature of the systems Paone accuses of infringement) is itself unreliable and based on unreliable data; and (v) his royalty rate is unreliable because, under controlling Federal Circuit case precedent, it is based on draft license offers that are not comparable to the license that Paone

and Microsoft would have reached under a hypothetical license negotiation on the facts of this case."

In response, Paone denies Microsoft's allegations with regard to its damages expert, Wayne Hoeberlein. Paone contends that Hoeberlein is a certified public accountant who has worked extensively in the area of litigation consulting for almost thirty years. Hoeberlein has provided financial consulting, damage analysis and expert testimony in connection with commercial litigation. In addition, Paone goes into an extensive response in his contention that Microsoft's arguments in opposition to Hoeberlein's testimony, "are based on incorrect legal standards and/or inaccurate or disputed statements of fact." (Pltf's Memorandum in Opposition at 1). In sum, Paone asserts that Microsoft's arguments are "directed to disagreements with Mr. Hoeberlein's conclusions, rather than his methodology; they only go to the weight of his testimony, not its admissibility under Rule 702." (Pltf's Memorandum in Opposition at 1).

While the Court agrees that most of Microsoft's contentions go to the weight of the testimony rather than its admissibility, because the subject of this litigation is complicated and requires a nuanced interpretation of the relevant technology, and because the Court has some questions as to the admissibility of the Hoeberlein testimony, the Court will grant Microsoft's request for a <u>Daubert</u> hearing.

## I. BACKGROUND

The '789 Patent and the Plaintiff's infringement claims have been discussed at length in prior decisions from this Court, namely the Court's order on the Defendant's motion for summary judgment, dated July 30, 2012. Therefore, the Court need not repeat those facts.

The most important thing to note for purposes of the present motion is that Paone's remaining infringement claims are apparently based on one type of technology— Temporal Key

Integrity Protocol ("TKIP"). TKIP is an industry-standard data encryption protocol used to encrypt and decrypt data that is transmitted over wireless local area networks. TKIP technology improves on prior wireless encryption standards by using a dynamic keying scheme in which the encryption key changes from one block of data to the next. The Defendant Microsoft implements or supports TKIP in many of its products, including Windows Vista, XP and 7, and Xbox 360. TKIP is incorporated in both Microsoft's hardware, which contain everything necessary to perform TKIP encryption and decryption, and in Microsoft's software, which includes dedicated TKIP functionality for configuring and driving wireless networking hardware to perform TKIP encryption and decryption.

Wayne Hoeberlein was retained by Paone as an expert in the area of damages and financial analysis. He submitted an expert report, on which his testimony is based, with regard to his opinions as to the amount of reasonable royalty damages owed to Paone by Microsoft due to Microsoft's alleged infringement of the '789 patent.

### A.  Hoeberlein's Qualifications

Hoeberlein has a Bachelor of Business Administration in Accounting from Hofstra University. He also received a J.D. from the Hofstra University School of Law in 1977. He is a Certified Public Accountant and a member of the American Institute of CPAs. Since 1982, he has worked exclusively in the area of litigation consulting, providing financial consulting, damages analysis, and expert testimony in connection with commercial litigation. Currently, he is a Director with Berkeley Research Group, LLC ("BRG") in New York, New York. BRG carries out financial, economic and accounting research and consulting services for firms, companies and government bodies on a variety of issues, including the analysis of damages in connection with intellectual property disputes, which accounts for a substantial amount of his

work. Hoeberlein has testified numerous times in federal court in matters relating to intellectual property.

**B. Basis and Summary of Hoeberlein's Expert Opinion**

Hoeberlein's opinions are based on his professional training and experience and his review and analysis of documents and information produced in the course of this litigation, including: various deposition transcripts; responses to interrogatories; responses to document requests; and other expert reports. His amended expert report is approximately 100 pages in length, and discusses both his opinions and his methodology.

Hoeberlein's analysis is an evaluation of Microsoft's allegedly infringing activity with regard to certain software products, assuming that the accused products are found to infringe the '789 patent after a trial. Under the provision of 35 U.S.C. § 284, a court shall award a patent owner damages adequate to compensate for infringement, no less than a reasonable royalty rate for the use made of the invention by the infringer. The Hoeberlein expert report explains that a reasonable royalty represents the payments that the alleged infringer should have made to the patent owner for the use of the patented technology. The reasonable royalty is usually determined by making reference to what the patent owner and infringer would have agreed to at the time of first infringement.

In Hoeberlein's opinion, the hypothetical arm's length negotiation in March 2003 between Paone and Microsoft would have resulted in a reasonable royalty of $0.13 applied to each of Microsoft's sales of the products incorporating the accused TKIP technology during the period beginning March 8, 2004, the date at which Microsoft allegedly knew or should have known of the infringement. Thus, the total reasonable royalties, calculated on this basis, is the sum of $110,843,334.

In order to assess the value of the '789 patent, Hoeberlein looked at the importance of the patent to Microsoft and its customers, especially in the respect that the TKIP feature provides positive security benefits to users of the accused Microsoft products. In particular, TKIP provides important data encryption enhancements which address known vulnerabilities of the previous wireless encryption technique—Wired Equivalent Privacy (WEP). Hoeberlein found that the value that the parties would have ascribed to TKIP at a hypothetical negotiation can be estimated through a price differential analysis of products both with and without support for TKIP. Thus, he reviewed a May 1, 2004 article from a magazine entitled Computer Shopper, which listed various pieces of wireless networking hardware that were available in or before 2004—close to the date of the first hypothetical negotiation in this case. Based upon his review of these products, their features, and their prices, he concluded that the difference in price between wireless adapters that supported the TKIP technology in 2003/2004 and those that did not was $35.21. Accordingly, he found that it was reasonable to conclude that some portion of this $35.21 difference represented the value of TKIP that Paone and Microsoft would have considered at a hypothetical negotiation, and ultimately concluded that $5.34 represents the value of TKIP functionality that the parties would have considered at a hypothetical negotiation.

Next, Hoeberlein assessed the likely royalty rate for a hypothetical negotiation between Paone and Microsoft in 2003. He explained that the rate for particular intellectual property rights may be based on the royalties paid for similar intellectual property in actual licensing transactions. He noted that the degree of reliance on comparable licensing transactions depends upon an assessment of whether the transactions are sufficiently similar to provide an indication of the value of the assets in question. In this regard, he searched publicly available data for information concerning license agreements for intellectual property that may be analogous to the

6

patent-in-suit. He identified several agreements that likely would have been considered by the parties at a hypothetical negotiation between Paone and Microsoft. After reviewing these particular policies, and determining that they were relevant to the hypothetical negotiations in this matter, Hoeberlein concluded that the running royalties that Microsoft apparently deems reasonable for its own patented technology range from 1% to 5% of net sales for software products and 0.5% to 2.5% of net sales for embedded products.

Finally, Hoeberlein reviewed the factors that can and should influence the outcome of a negotiation and help define the parties' bargaining positions, as set forth in Georgia-Pacific Corp. v. United States Plywood Corp., 18 F. Supp. 1116, 1120 (S.D.N.Y. 1970). He considered all fifteen factors in light of the information he claimed was available in order to determine what Paone and Microsoft, as willing licensor and licensee, would have agreed to at the time the infringement began.

In the end, Hoeberlein opined that a hypothetical negotiation between Paone and Microsoft would have resulted in a reasonable royalty of $0.13 applied to each product incorporating the accused TKIP technology beginning on March 8, 2004, the date at which Microsoft knew or should have known of the infringement. The royalty was calculated by applying a rate of 2.5% to the value of TKIP that the parties would have considered at a hypothetical negotiation, which would have been $5.34. This rate falls within the 1%–5% range of rates offered under what Hoeberlein found to be analogous licensing agreements.

**C. The Instant Motion**

Pursuant to Fed. R. Evid. 702, the Defendant Microsoft now moves to exclude the testimony of the Plaintiff's damages expert, Wayne Hoeberlein. According to the Plaintiff, Microsoft's arguments are directed to disagreements with Mr. Hoeberlein's conclusions rather

7

than his methodology; they go only to the weight of his testimony, not its admissibility under Rule 702. On the other hand, the Defendant claims that his testimony should be excluded for any one of the reasons described below.

> **1. As to the Royalty Base's Inclusion of Sales Units Not Part of Allegedly Infringing System**

First, the Defendant argues that Hoeberlein's royalty base is unreliable because it includes "sales units" not part of an allegedly infringing system and never used to allegedly infringe. To put this argument in simpler terms, Microsoft argues that while many of the products it sells are capable of utilizing the infringing technology—so that it would be liable for contributory infringement—not every product it sells actually ends up utilizing the infringing technology. For this reason, Microsoft contends that it is speculative and unreliable for Hoeberlein to include every single sales unit as part of a hypothetical royalty rate, because Microsoft never would have agreed to pay a royalty for a certain unknown percentage of products that would never infringe the Plaintiff's patent.

To delve deeper into the technological dispute at issue, there are several Microsoft products that have been included in the Plaintiff's royalty base that undisputedly do not infringe, such as a stand-alone computer system (i.e., a PC running Windows) that is not connected to any wireless network. Although this computer may have wireless capability and be capable of TKIP encryption, the computer user may not actually utilize the patented TKIP encryption for a number of reasons. Indeed, there is no guarantee that any copy of Windows sold by Microsoft will end up in an allegedly infringing system. Thus, in the Defendant's view, for the Plaintiff to include this type of sale in its royalty base would be inaccurate and unreliable. In particular, Microsoft argues that absent a reliable estimate of how many products actually end up in allegedly infringing system, the jury can only speculate as to the appropriate sales base for a

8

damages calculation.  See IP Innovation LLC v. Red Hat, Inc., No. 2:07-cv-447, 2010 U.S. Dist. LEXIS 28372, *8 (E.D. Tx. Mar. 2, 2010) (Rader, C.J. sitting by designation) (precluding expert testimony where expert "made no effort to factor out of his proffered royalty base those operating systems in which the user never affirmatively enables" the claimed invention).

In response, Paone contends that Hoeberlein reasonably concluded that the parties would have agreed to include *all* sales of Microsoft's products that are capable of TKIP technology, rather than limiting the base to only those products that are actually proven to be incorporated into TKIP-enabled wireless networks.  The basis for this conclusion is first, that Microsoft would have wanted to avoid any requirement that it track the usage of its products to determine how many units it would need to pay a royalty, and second, that there is value in every Microsoft product that has TKIP functionality, even if it is never used in practice.

**2. As to the Royalty Base's Inclusion of Sales Units Found in Allegedly Infringing Systems Outside of the United States**

Next, Microsoft argues that Hoeberlein's royalty base is unreliable because it includes "sales units" that — if part of or used in an allegedly infringing system — are found and used in such systems outside the United States, and thus beyond the reach of U.S. patent law.

When allegedly infringing third-party systems are made or used only outside the United States, they do not directly infringe under the U.S. patent laws.  35 U.S.C. § 271(a) ("[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . infringes the patent").

According to Microsoft, Hoeberlein's damages base must be limited to sales units that are incorporated into infringing systems *only* in the United States.  However, Hoeberlein relied on revenue data that did not indicate where the infringing systems were ultimately made and used. Instead, he include units in his royalty base that were sold to companies that were headquartered

inside of the United States. In other words, he merely sorted out revenue from a U.S. headquartered computer manufacturer (i.e., Dell) as opposed to a foreign headquartered manufacturer (i.e., Sony). Yet, Microsoft points out that a U.S. based company such as Dell still manufactures computers in Mexico and ships them to Japan. Thus, the Defendant asserts that this type of sale should not be included in a royalty base because even if that computer ultimately forms part of an infringing system so that use is made of the invention in Japan, that itself is not prohibited under U.S. law.

On the other hand, the Plaintiff claims that Hoeberlein included only Microsoft's U.S. sales and filtered out foreign sales. Paone urges that Hoeberlein's approach was appropriate in light of the available information. Namely, the Plaintiff argues that Hoeberlein reasonably relied upon financial data produced by Microsoft and made just and reasonable inferences based on those documents in an effort to determine the appropriate royalty base in his damages analysis. According to the Plaintiff, Paone made a discovery request to Microsoft that it provide data of sales *in the United States*, and the fact that these "U.S." sales figures may include some unknown amount of data related to foreign sales, should not preclude the admission of Hoeberlein's testimony.

### 3. As to the Royalty Base's Inclusion of Access Rights and Periodic Payments

Another basis for Microsoft's motion to exclude is that Hoeberlein's expert testimony regarding a hypothetical royalty rate is unreliable because it includes a certain number of units that are merely various forms of Windows software licenses. In this regard, his royalty base includes access rights—which have no software functionality—and counts periodic payments for single "sales units" as if they were multiple "sales units". The Court will address each of these contentions in turn.

10

First, the royalty base put forth by Hoeberlein includes what are called client access licenses (CALs), which are proprietary software licenses distributed by software companies such as Microsoft to allow clients to connect to its server software and use the software's services. Thus, a CAL legally permits client computers to connect to Microsoft sever software. CALs apply to either a specific "device", as defined in the license agreement, or to a specific "user".

The Defendant argues that CALs are not software, but rather rights to legally access a server. Thus, a CAL is not a piece of hardware or software. For this reason, it has no TKIP-related functionality or any functionality for that matter. Consequently, Microsoft contends that Paone should not receive an additional 13-cent royalty for each CAL.

In response, the Plaintiff argues that CALs help in providing the ability for the server to configure TKIP for a client, because without CALs, such a configuration would not be possible. According to the Plaintiff, CALs play a critical role in enabling Microsoft's customers to make and use infringing TKIP-enabled wireless systems, and thus he maintains that the inclusion of CALs in a royalty base is reasonable and appropriate. However, the Plaintiff fails to explain why the CALs are deserving of a royalty when a royalty is already being assigned for both the server and client.

As for the second issue with regard to software licensing, Microsoft argues that Hoeberlein improperly counted Windows licenses that are sold on a hosted basis. As Microsoft explains, hosted transactions are a type of licensing arrangement where a company like Microsoft "hosts" the product at issue. Thus, a client has something akin to subscription for the license where they pay for it over a certain term. For this reason, Microsoft's sales data reflects 12 units annually for any given customer. However, this customer is not actually receiving 12 licenses. Rather, he or she is continually accessing the product with the accused infringing

11

technology over the course of one year, but paying a monthly fee to the Defendant to do so. For this reason, Microsoft argues that it is over-counting for Hoeberlein to charge 12 royalties annually for one delivery of actual Windows software.

With respect to hosted transactions, the Plaintiff only responds that there is no evidence other than unsubstantiated hearsay to support the notion that Microsoft's sales data records 12 units annually for any given customer.

### 4. As to the Methodology for Valuing TKIP

The Defendant also takes issue with Hoeberlein's methodology for valuing TKIP, claiming that it is based on unreliable data and is unreliable. Specifically, Hoeberlein uses WPA encryption as a proxy to determine the value of TKIP encryption. However, Microsoft argues that WPA has more functionality than TKIP so that any comparison of the two is unreliable, and that Hoeberlein does not sufficiently explain why the two technologies are similar. In addition, Microsoft contends that the valuation of WPA is detrimentally flawed. In this regard, the Defendant raises several arguments in connection with Hoeberlein's approach to the valuation described above—namely, utilizing one particular magazine article to create a price differential for wireless routers with or without WPA functionality. Microsoft asserts that Hoeberlein's factual assumptions are incorrect. For instance, one particular adapter does not even include WPA, but rather requires a separate download, so that its price would not even reflect the infringing technology as Hoeberlein contends. Further, Microsoft argues that Hoeberlein fails to provide an opinion as to why the $5.34 price difference is statistically significant.

The Plaintiff contends that Microsoft's criticisms are steeped in fact-based assertions that are proper for cross-examination because they go to the weight of Hoeberlein's opinions, but do not speak to their admissibility. In essence, Paone states that the valuation of TKIP involves

factual disputes, and that it is not the district court's role under <u>Daubert</u> to evaluate the correctness of facts underlying an expert's testimony.

**5. As to the Royalty Rate**

Finally, Microsoft argues that Hoeberlein's royalty rate of 2.5% is unreliable because, under controlling Federal Circuit case precedent, it is based on draft license offers that are not comparable to the license that Paone and Microsoft would have reached under a hypothetical license negotiation on the facts of this case.

The Federal Circuit requires that, when licenses under other patents are used to inform the hypothetical negotiation analysis, the damages expert must prove that they are sufficiently comparable to the hypothetical license at issue in the suit. Thus, any technological or economic differences between purportedly "comparable" licenses and the hypothetical negotiation must be accounted for and explained.

Here, Hoeberlein arguably disavowed two of the "comparable" licenses at his deposition, so that the only agreements left to compare to are either drafts or unsigned form offers. In addition, the Defendant points out that the agreements that Hoeberlein attempts to use to inform the hypothetical negotiation analysis are not comparable because they are based on complex licensing arrangements, not a onetime hypothetical negotiation.

Paone argues in response that first, Hoeberlein has not disavowed reliance on any of the arguably comparable licenses at his deposition. Second, he asserts that Hoeberlein properly relied upon comparable license agreements, and properly considered the differences between those agreements and the hypothetical negotiation in this case.

## II.  THE DAUBERT BACKGROUND

Prior to the Supreme Court's interpretation of Rule 702 of the Federal Rules of Evidence in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ("Daubert"), the test to determine if scientific evidence was admissible at trial was whether the evidence was "generally accepted" as reliable within the relevant scientific community.  See Frye v. United States, 293 F. 1013 (1923).  Daubert, however, held that the Frye test, as it had become known, was superseded by the adoption of the Federal Rules of Evidence.

> Rule 702, entitled "Testimony by Experts," states that:
>
> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Examining Rule 702, the Supreme Court in Daubert provided a flexible analysis to guide trial courts in determining whether proffered submissions of scientific evidence are admissible.  The Supreme Court emphasized the "flexibility" that should guide the trial court when making a determination of the admissibility of scientific evidence and stressed that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 595 (citation omitted).

> When faced with an offer of expert testimony, the Supreme Court in Daubert stated that:
>
> the trial judge must determine at the outset, pursuant to Rule 104(a) whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

14

Id. at 592–93 (citations omitted). The Supreme Court provided a list of factors for a trial court to consider when making this determination, but stressed that "we do not presume to set out a definitive checklist or test." Id. at 593.

The four factors include: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in the case of a particular scientific technique; and (4) whether the theory or technique is generally accepted within the relevant scientific community. Id.; see generally, Zuchowicz v. United States, 140 F.3d 381 (2d Cir. 1998); Iacobelli Constr., Inc. v. County of Monroe, 32 F.3d 19 (2d Cir. 1994); Zwillinger v. Garfield Slope Housing Corp., No. 94 Civ. 4009, 1998 WL 623589 (E.D.N.Y. Aug. 17, 1998); Marmol v. Biro Manufacturing Co., No. 93 Civ. 2659, 1997 WL 88854 (E.D.N.Y. Feb. 24, 1997).

While the four guidelines enunciated in Daubert "leave in place the 'gatekeeper' role of the trial judge in screening such evidence," General Electric Co. v. Joiner, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997), the Second Circuit in McCullock v. H.B. Fuller Co., 61 F.3d 1038 (2d Cir. 1995) held that:

> Trial Judges must exercise sound discretion as gatekeepers of expert testimony under Daubert. [The Appellant], however, would elevate them to the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of the expert witness's soul – separating the saved from the damned. Such an inquiry would inexorably lead to evaluating witness credibility and weight of evidence, the ageless role of the jury.

Id. at 1045.

In sum, the Federal Rules of Evidence, the Supreme Court's decision in Daubert, and the principles and guidance of the Second Circuit require this Court, when making a decision as to whether to admit expert testimony to: (1) determine whether the witness is qualified to testify as an expert by examining the witnesses educational or experiential qualifications in the relevant

15

field; and (2) using the four non-exhaustive factors enunciated in Daubert as guidelines, determine whether the proposed testimony will involve the relevant specialized knowledge that will assist the trier of fact to understand or to determine a fact in issue.

Following Daubert, it has become a well-accepted principle that Rule 702 is to be interpreted in a liberal standard of admissibility, which is a departure from the more restrictive Frye standards. See Nimely v. City of New York, 414 F.3d. 381, 395 (2d Cir. 2005). However, despite a more permissive approach to expert testimony, the Court must ensure that "any and all scientific (or other expert) testimony or evidence admitted is not only relevant but reliable." Daubert, 509 U.S. at 589.

Following Daubert, in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), the Supreme Court further explained the new rule that, "whether a witness's area of expertise was technical, scientific, or more generally "experience-based," Rule 702 required the district court to fulfill the "gatekeeping" function of "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

Also, as stated above, the requirement of "reliability" is extremely important and requires a clear analytical connection between the expert's methodology and his conclusions. So that Daubert and Rule 702 "mandate this exclusion of . . . unreliable opinion testimony." Amorgisnos v. Natk P.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002). The Supreme Court assigned to the trial judge the task of ensuring that an expert's testimony rests on a reliable foundation and is relevant to the issues in the case. Further, the Supreme Court has given the

trial judge latitude in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable. (Daubert, id. at 152).

It is within this framework that the Court will exercise its gatekeeper role and address this motion by Microsoft to exclude the testimony of Wayne Hoeberlein.

### III. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the parties are directed to appear for a Daubert hearing on Wednesday, May 8, 2013, at 9:30am. If necessary, the hearing will continue the following day, May 9, 2013, at 9:30am.

**SO ORDERED.**
Dated: Central Islip, New York
April 25, 2013

                                                        */s/ Arthur D. Spatt*
                                                        ARTHUR D. SPATT
                                                   United States District Judge